## MURRAY v. FALES.

CONTRACTS — ENFORCEMENT — INJUNCTION—ESTOPPEL—EVIDENCE—
SUFFICIENCY.

On a bill to enjoin the payment of royalties for the right to
sell and administer certain remedies, evidence examined, and
*held*, to sustain complainant's claim that defendant repre-
sented to him that by making a certain purchase he would
become sole owner of the right.

Appeal from Kent; Perkins, J. Submitted May 4,
1905. (Docket No. 141.) Decided January 23, 1906.

Bill by Dennis Murray, individually, and as trustee of
Charles M. Beckwith, against James W. Fales and the
Keeley Institute Company of West Michigan, to restrain
the collection of royalties. From a decree for complain-
ant, defendant Fales appeals. Affirmed.

*George E. Nichols*, for complainant.

*James H. McDonald* and *Lloyd L. Axford*, for appel-
lant.

MOORE, J. The bill of complaint in this case was filed
in complainant's own behalf and as trustee of the interests
of Charles M. Beckwith. It is an injunction bill. After
a hearing a decree was entered containing the following
provisions:

"1. That a perpetual injunction issue out of and under
the seal of this court enjoining the defendant, the Keeley
Institute of West Michigan, from paying over any moneys
as royalties on the contract mentioned in said bill of com-
plaint and answer and received in evidence, wherein the
said Keeley Institute of West Michigan contracted to pay
certain royalties to George W. Fales, which said contract
was afterwards assigned to said James W. Fales, the de-
fendant herein; and that said Keeley Institute of West
Michigan, from the time of the entry of said decree, do

pay, and is hereby required to pay, said royalties under said contract to the complainant assigned.

" 2. That the said complainant, Dennis Murray, and Charles M. Beckwith, are herewith decreed to be the sole and exclusive owners of the franchise and rights upon which the 1st day of December, A. D. 1891, were, by the Leslie E. Keeley Company, a body corporate of the State of Illinois, set over, transferred, and conveyed to the Keeley Institute, a body corporate under the laws of the State of Michigan, in pursuance of a certain contract upon said date entered into by and between said Leslie E. Keeley Company and the said Keeley Institute, which said contract in and by its terms granted and conveyed to said Keeley Institute, its successors or assigns, the sole and exclusive agency for the sale and administration of Dr. Leslie E. Keeley's chloride of gold remedies in the State of Michigan; and that the said defendant James W. Fales has no right, title, or interest in and to any part of the territory of the State of Michigan, or the title to any portion of said franchise, by reason of any conveyance to him, by the said Keeley Institute, or in any other manner; and that the entire rights of said James W. Fales in and to the entire State of Michigan, held by him in any manner or form, are hereby declared and decreed to be in the said complainant and the said Charles M. Beckwith.

" 3. That the said James W. Fales pay to the said complainant and the said Charles M. Beckwith all moneys which the said Keeley Institute have heretofore paid to him under protest as royalties within 60 days after the entry of this decree, which said royalties amount to the sum of $170.88, together with the interest thereon from the date of each respective payment at the rate of 5 per cent.

" 4. That the clerk of this court, to whom there has been paid certain royalties from time to time by the order of the court, is hereby directed to pay to the said complainant, Dennis Murray, and the said Charles M. Beckwith, all of the moneys in his hands which have been paid to the said Keeley Institute under the order of the court.

" 5. That the said Dennis Murray and Charles M. Beckwith are hereby declared and decreed to be entitled to hereafter receive from the Keeley Institute of West Michigan any and all royalties that may become due under the terms of said contract between said company and the said George W. Fales, and are authorized and empowered to collect from said company said royalties, and in

every other way are hereby declared to be the owners and entitled to all of the benefits and subject to all the liabilities of the said George W. Fales and his assignee under the terms of said contract."

From this decree defendant Fales has appealed.

It was the claim of complainant that Mr. Beckwith was interested as a stockholder in and manager of the Keeley Institute Company of West Michigan, doing business at Grand Rapids, and a like institution in Detroit. The rest of his claim cannot be better stated than by quoting the substance of the testimony of Mr. Beckwith as follows:

"I took charge of the business on May 6, 1902, at Detroit, at the corner of Cass street and Lafayette avenue, and continued it until it was closed November 8th of the same year. While operating the Detroit institute I happened to go in James W. Fales' place of business to buy some office supplies, and met Mr. Fales himself. * * *

"Mr. Fales waited upon me, and after making the purchases I asked that they be sent up to the Keeley Institute, giving him the address. Mr. Fales wanted to know if I was connected with the institute, and I told him I was running it. He stated: That he had formerly been in the Keeley business. He was one of the original purchasers of the Keeley rights in the State of Michigan, and that he was one of the parties that opened the first institute in Michigan at Northville, and that he was actively connected with the business for several months at that place, until some of the other parties interested wanted to move from there. Their intentions were of going to Ypsilanti. That he did not approve of that, and he, in fact, wanted to remain where they were. He said that Mr. Waring was also of the same opinion; but, however, the institute was moved from Northville to Ypsilanti, and that he and Mr. Waring, when the institute was moved to Ypsilanti, opened institutes at other points, Mr. Waring at Alma, and he at Benton Harbor. He said that he operated the Benton Harbor institute for a year or two, and it did not pay, and that the parties who had purchased an interest at Ypsilanti became dissatisfied and brought suit against himself, Mr. Radford, and Mr. McVittie, the parties that were the owners of the Keeley franchise in the State of Michigan, and that he closed up the institute at Benton Harbor, and as the business at Ypsilanti was in a bad way

or in debt, or something of that sort, that they entered into an agreement with Mr. Waring, selling out to him all their rights in the franchise for the State, and Mr. Waring closed his institute at Alma and moved the Keeley business for the State of Michigan to Detroit, that he did not believe that Mr. Waring had ever paid for it, and that the facts were that he and Mr. Radford and Mr. McVittie were the sole owners at that time of the franchise for the State of Michigan. And he questioned me in regard to how I was operating. I told him that I had a lease from Mr. Waring. That Mr. Waring had represented to me that he was the absolute owner of the franchise for the State of Michigan.

" *Q.* Did you tell him the terms of the lease ?

. " *A.* Yes; he asked me what I was paying. I told him I was paying Mr. Waring $30 semi-monthly, payable on the 1st and 15th of each month and also paying him a royalty of $2.50 per month on every patient treated for the first year. After the first year it was to be $5. * * *

" The statement Mr. Fales made was he did not believe my lease was worth anything, that he was positive that Mr. Waring never had carried out the terms of this contract with himself, Mr. McVittie, and Mr. Radford, and although he did not know just how the matter stood, but that was his belief. I asked him why he could not give me definite information in regard to it, and he said this deal made with Mr. Waring was consummated several years before that—I think he gave me the year 1894—and that the transaction was carried on by Mr. Radford, and that Mr. Radford had all the papers, and his memory was very poor in the matter; that he could not tell just what there was to it; but that Mr. Radford could give all the facts in the case. I asked him, if he could not find it out, find out and let me know, and he told me the better way would be for me to go right to Mr. Radford. * * *

" He said the best way to do would be to buy up the rights of himself and Mr. McVittie and Mr. Radford and he said he would be willing to sell his interest, and he thought that Mr. Radford would do the same and Mr. McVittie, and he says: ' You go and see Mr. Radford and any deal you make with him will be perfectly satisfactory to me, as we will probably see each other, and he will handle the deal.' * * * As far as he was concerned, he would be glad to see the franchise (for the State) sold to some party that was interested in the work and would go ahead and run it in a way he thought it ought to be.

" *Q.* During that conversation was the matter of your connection with the Keeley Institute of West Michigan taken up and talked about?

"*A.* Yes.

" *Q.* What was said about that ?

" *A.* Well, Mr. Fales asked me how I came to buy in the Keeley business, and I told him that I was financially interested in the Keeley Institute at Grand Rapids. *

* * Mr. Fales told me that he did not know there was an institute running in Grand Rapids. He said in fact he did not know there had been any other institute in Michigan until I told him of it, since the institutes were closed at Benton Harbor and Alma and Ypsilanti, and one of them in Detroit. He asked me how long it had been at Grand Rapids, and I told him it had been opened here in the year 1900. And he wanted to know how the business was doing here. I told him that business had not prospered in Grand Rapids; that they had just about been able to run along and keep the institute going; that the expenses here at Grand Rapids of running the institute were very heavy, and that there had been times when I thought that perhaps the institute would have to close; the rentals and other expenses could hardly be met; that, in fact, I had to personally borrow money that spring in order to pay certain accounts or indebtedness of the institute that was crowding. He wanted to know how extensively interested I was, and I think he asked me about the business end of it. I told him it was a stock company, and I had been the owner up to six months before that of a small portion of the stock, but that before going to Detroit I had purchased a sufficient amount of the stock, so that I owned a controlling interest here at Grand Rapids. He asked me how I liked the business, and I told him I liked it, but that under the conditions in which I had been operating the institute that it had not been very pleasant, the difficulties were so great in the way of keeping them going; * * * that after the institute had been — or the company had been—organized here that it was discovered that we did not know anything here at Grand Rapids except we had a lease which allowed the company to operate an institute here at Grand Rapids under certain conditions which necessitated our running the business continuously; * * * that I had learned about the chance to get hold of the Keeley Institute in Detroit; that I had gone down there and seen Mr. Waring and under

142 MICH.—39.

the representations he had made to me I had entered into the lease which I had there, and that was the situation. Well, Mr. Fales told me : ' I don't know anything about the Grand Rapids Institute; never heard of it; didn't know there was an institute there.' He said : ' I didn't know there was an institute running in Western Michigan after the time I closed the institute there.' I said to him it was a very funny condition of affairs. We had got a lease in Grand Rapids, we are running there, and you tell me that you are one of the owners of the Keeley rights in the State of Michigan, and that there is no authority for that lease, of running that institute. He said, ' That is a fact.' He says : ' I don't think you have got any rights there at all.' I told him where we got them. I told him we got them through George W. Fales, of Benton Harbor. I had, during the time I had been connected there, been paying royalties to him for patients treated. He said he never understood that George Fales got any royalties, or that there was any such deal in existence. ' Well,' I said to Mr. Fales, ' If that is the case, I don't see but what the only thing for me to do is to close up this institute here at once and abandon it, and I do not propose to lose the money that I have invested in Grand Rapids. Somebody is going to settle. Somebody has been doing crooked work here.' · ' If Mr. George Fales never had any right to issue a lease like that,' he says, ' he has got to settle with me,' and I says, ' I am not going to lose anything. Of course, if I could buy the rights for Michigan, why it would enable me to save the money I have got invested in Grand Rapids and at the same time continue and run the institution in Detroit.' ' Well,' Mr. Fales said to me, ' why don't you buy them ? ' I told him I was not a man of very much means, and I did not see how I could. ' Well,' he says, ' I think, Mr. Beckwith, that you can buy the rights without any trouble.' He says, ' I am perfectly willing to sell my interest in the Michigan franchise, and I think Mr. McVittie and Mr. Radford are.' ' If you go to Mr. Radford,' he says, ' I guess you will probably find out that you can make a deal.' "

He further testified :

" I called at Mr. Radford's office. * * * I introduced myself to him; I told him that I was there to find out the situation in regard to the ownership of the Keeley franchise for the State of Michigan. Mr. James W. Fales had sent me to him, and told me he was a part owner of

it, and that he and Mr. McVittie owned the balance of the interest.    He says:    ' That  is  true.'    *    *    *    ' Mr. Fales tells me you have got all the papers in connection with this sale that was made to Mr. Waring, and my lease here with Mr. Waring is for a term of years.    Mr. Fales informs me he doesn't think it is worth anything; my lease is void.'    ' Well,' he says, ' I think it is.'    And he says, ' Just excuse me a minute,' and he went on into his other office and came back with the files, opened them up. He says:    ' Here are all the papers in connection with it. Now, whatever you want to know,' he says, ' I think I can tell you in a very few minutes.'    I says:    ' Are you gentlemen in a position to give a contract for the sale of this franchise for the State of Michigan ?'    He says:    ' Yes, sir; here is the contract we made with Mr. Waring, and he has never·paid it.'    Then I told him of my talk with Mr. Waring.    I says:    ' Mr. Waring says he owns the franchise; that this contract is outlawed.'    Mr. Radford, laughing, said:    'He doesn't know what he is talking about.'    He says:    ' This contract is under seal and is just as binding as the day it was made.    Now,' he ·says, ' if you want to buy this franchise, we are in position to sell it to you.'    I says: ·' Mr. Radford, I would like to know what papers you have and what papers you have got here.'    He says:    ' Here is the contract with Mr. Waring, and when we sold this to Mr. Waring we sold him everything that pertained to the Keeley Institute for the State.'    He says:    ' Here is the stock of myself and Mr. Fales and Mr. McVittie.'    He says:    ' We hold as collateral; we were to hold it until this contract was paid; and,' he says, ' here are some other papers; here is a mortgage that runs to us.'    He says:    ' Here is the lien on the franchise.' "

His further testimony is that he was shown the papers and he was assured they were in a condition to be foreclosed against Mr. Waring, and, when this was done, the purchaser would be the owner of the right to use the Keeley remedy for the entire State of Michigan; that he made the purchase, and afterwards settled with Mr. Waring and obtained his interest; and that after doing so Mr. James W. Fales obtained an assignment from Mr. George W. Fales of his contract with the Keeley Institute Company of West Michigan, and asserted his right to col-

lect royalty, and hence this suit.  It is the claim of James W. Fales that before his talk with Mr. Beckwith he had become the owner of the right to use the remedy in the western part of Michigan, which by various leases had come to his brother, George W. Fales, and that he did not sell his interest therein to Mr. Beckwith, that the sale made to Beckwith was indicated by the papers which were drawn, and that they did not purport to convey the interest to the entire State.  He also claims he had no actual interest in the eastern part of the State but simply represented Mr. McVittie.

We think the question is, Was it represented to Mr. Beckwith by Mr. Fales that Mr. Fales, Mr. McVittie, and Mr. Radford were the owners of the right to use the remedy for the State of Michigan, and that by making the purchase of them which Mr. Fales proposed Mr. Beckwith would succeed to that right?  The circuit judge in whose presence many of the witnesses, including James W. Fales and Mr. Beckwith, testified, found Mr. Beckwith's version of the transaction was true.  There are many things in the record to corroborate Mr. Beckwith. On the cross-examination Mr. Fales testified, among other things:

"Some time in the fall of 1902, I do not recall the date, Mr. Beckwith came into my store, and during the course of some purchases there the matter of his being connected with the Keeley Institute in Detroit came up.   *   *   * On that day he told me that he was operating here in Grand Rapids under a contract or some authority, and I told him I did not know about that.  I did not know anything about the institute here in Grand Rapids.  At least if I did, I had forgotten it, and I wanted to inquire and would inquire of my brother about the transfer.  I think that is about all that was said; that was the first interview I had with him.  I intimated to him that he had better inquire of Mr. Radford about Mr. Waring's rights in the eastern part of the State.  I cannot say just what I did say.  No; he did not explain any details to me about the Waring purchase.  I do not recall his telling me then that he came down to Detroit and had entered into a lease with Mr. Waring or giving me the terms of the lease.  I

do not think he did so at the second meeting, though he may have done so. I am not positive.

"*Q.* Didn't you say to him you did not understand that Mr. Waring had any rights, that he had forfeited the same, and that you and Mr. McVittie and Mr. Radford were the owners of that entire matter?

"*A.* I do not think so.

"*Q.* Will you say you did not make that statement?

"*A.* Well, I can't say that I did not.

"*Q.* You can't say that you did not?

"*A.* No, sir.

"*Q.* And didn't you also advise him to go and see Mr. Radford, and that Mr. Radford would tell him what the situation was and explain it to him?

"*A.* Yes; I told him that I knew nothing about it; that he better go and see Mr. Radford because he had all the papers and everything in hand; that I had understood—

"*Q.* And didn't you in that same talk say to him that you did not know—that you had no recollection or could not understand—how any one had any right to give him any lease to operate an institute in any part of the State?

"*A.* Yes, sir. * * *

"*Q.* His statement at the time that he first talked with you and the reason he went to Mr. Radford was on account of your suggestion that the parties would be willing to sell. You have no recollection of any such statement being made to him?

"*A.* No; I do not remember it.

"*Q.* Would you say you did not make any such statement?

"*A.* No; I will not. I do not know why I should tell him I owned Michigan. Why was it necessary I should tell him I owned Michigan as long as there was no controversy about it?

"*Q.* You understood from your talk with him, didn't you, that he was operating over here in Grand Rapids by some arrangement with your brother, George W. Fales?

"*A.* Yes; I didn't want to bring any reproach upon my brother. I wanted to find out, and I understood that he was paying George W. Fales royalties. I do not think he mentioned that he was desirous of getting the other side of the State so there would not be any competition of ownership. He had leased it from Mr. Waring. I think I may have intimated to Mr. Beckwith that Mr. Waring did not have any right. No; I did not give him to under-

stand or intimate that my brother did not have any rights. I told him to go and see Mr. Radford in regard to his contract with Mr. Waring. There wasn't any necessity for distinguishing the territory at all, because I owned the western part of the State and had no interest in the eastern part of Michigan. I simply put him upon inquiry in regard to his property that I supposed he had bought. I got the western part of the State by lapsing of the contract for certain payments, and, if those payments were not made, the property was to revert to me. I did not take any steps to declare a forfeiture of that contract. It is as I supposed declared itself.

"*Q.* Then, if you owned and understood you owned, and it was agreed and had been for years between your brother George and yourself, as you state here, that you were the owner of that territory, will you explain why you went to him and got an assignment of that contract and of his rights on the 4th day of October, 1902? * * *

"*A.* Well, I think he sent me an order on Mr. Beckwith. I am not positive whether he sent me this assignment which has been read in evidence. It was executed at Benton Harbor. I do not remember whether he mailed that to me, or brought it to me. I think he mailed it to me.

"*Q.* Have you got the letter, or copy of the letter, that you wrote your brother at that time, with you?

"*A.* No, sir, I have not. I think I kept a copy of it, I am not sure. I did not ask him to make this assignment. He made it of his own free will and accord. It was voluntary. * * * My brother explained to me that he thought I paid in a good deal of money there, and any benefits that were accruing I should have them. Afterwards, when he visited me, that was the explanation."

The assignment from George W. Fales to James W. Fales recites a consideration of $1 and other valuable consideration. There is no claim anything was in fact paid at the time it was made. The case is not free from doubt, but we think the complainant has established his case by a strong preponderance of evidence.

The decree is affirmed.

CARPENTER, C. J., and McALVAY, BLAIR, and HOOKER, JJ., concurred.