MURRAY *v.* KEELEY INSTITUTE OF WESTERN MICHIGAN.

1. ACCOUNTING—PARTNERSHIP—CORPORATIONS.

Complainant and defendant B. about the same time became connected with defendant corporation as stockholders. The financial affairs of the company had become involved and some litigation was pending relative to the right to conduct the business. Defendant B., after having been adjudged a bankrupt, and become personally involved in extensive legal controversies, got complainant to join him as a partner in the business of operating defendant company and another like concern, in which he was then interested. Complainant was to have a half interest in the holdings of B., including half the stock held by the latter in defendant corporation. By a settlement with the owners of the original franchise in Michigan the parties became the holders of the exclusive rights in this State. They organized a corporation to conduct the business in Detroit but no institution was opened. They, also, acting in conjunction, secured other stock in the defendant concern and became the principal stockholders, B. holding a majority of the stock in his name. For a time each had a salary, which was finally discontinued. In proceedings by one of the parties for an accounting proof was made tending to show juggling of accounts and withdrawal of money by B., who eventually used his majority control to secure complete management of the corporation. *Held*, that the venture was a joint enterprise in the nature of a partnership and that the complainant was entitled to an accounting of receipts and disbursements and to a credit for money charged by B. to complainant, which he did not receive: also, that he was entitled to half the stock and assets of the two corporations owned by him and B. and to half of the profits shown.

2. SAME—RECEIVER—PARTNERSHIP.

But without any proof of insolvency or financial embarrassment of either corporation complainant could not have a receiver appointed to wind up the affairs of the companies.

3. Same—Equity.

Courts of equity will not, ordinarily, by virtue of their general equitable jurisdiction, or by virtue of their visitatorial powers over corporate bodies, sequestrate the effects of the corporation or take the management of its affairs from its officers and commit it to a receiver, whether upon the application of creditors or of shareholders.

4. Same—Winding Up—Equity—Sequestration.

Partnership property held in the name of one partner is held in trust for the partnership. Death of one of the partners dissolves the firm and as a general rule the survivor is entitled to possession to settle the affairs of the enterprise, but where the matter was complicated by the interposition of two corporations having a separate legal entity, the right to control the business could not be taken from the proper managing officials and board.

Appeal from Kent; Brown, J. Submitted October 7, 1915. (Docket No. 22.) Decided March 30, 1916.

Bill by Dennis Murray against the Keeley Institute of Western Michigan and others for an accounting and for other relief. From a decree for complainant, defendants appeal. Affirmed, and case remanded for further proceedings.

*Charles A. Watt*, for complainant.

*George E. Nichols*, for defendants.

Steere, J. This litigation arose out of differences which developed between complainant and Charles M. Beckwith (deceased subsequent to the hearing herein) over their rights and interests in the two defendant corporations, which they together controlled and practically owned. Emma A. Beckwith is the widow of deceased, and Guy A. Beckwith is his brother. The pleadings, which cover 129 pages of the printed record, followed by sustaining and disputing evidence, oral and written, tell a long and tangled tale involving the history of the so-called "Keeley cure" operations in

this State and the connection of the contesting parties with that business.

Complainant's bill, filed on March 18, amended July 8, 1911, in the circuit court for Kent county, prays for a general accounting of all dealings between the various parties to this suit since the advent of complainant as a stockholder in defendant companies; that a receiver be appointed to carry on and wind up the affairs of said companies, and particularly for an accounting between complainant and the three Beckwith defendants; also that the latter be restrained by injunction from further managing or controlling the property, assets, or.the stock they own in said companies.

Defendants by their answer and cross-bill review and make general denial, or explain in detail from their standpoint complainant's allegations and charges. The cross-bill as to Charles M. Beckwith joins in complainant's prayer for an accounting between himself and the defendant corporations, "or any other person" connected with the business in which he was engaged; asks for an injunction to restrain complainant from selling, transferring, or incumbering any stock or stock rights in said corporations during the pendency of the suit, and that defendant Beckwith have a lien upon all stock or stock rights found standing either in the name of said complainant or himself as determined by this court in a former case.

Originally Detroit parties procured from the Keeley Institute of Dwight, Ill., the right to sell and use its remedies and methods in the State of Michigan, paying $30,000 for the same. On December 31, 1891, they organized the Keeley Institute of Michigan, capital stock $50,000, located at Northville. In May following they changed their headquarters to Ypsilanti at the same time increasing their capital stock to $250,000. Three weeks subsequently they subdivided their territory into eastern and western branches, with head-

quarters respectively at Detroit and Benton Harbor, and a Keeley institute was run at the latter city for a time. After two years and various manipulations and transfers one Louis P. Pritchard appeared at Grand Rapids claiming to be the owner of the western branch, under an assignment of a previous owner named O'Dell, and on January 19, 1901, launched the "Keeley Institute of West Michigan," with a nominal capital stock of $30,000, to be located at Grand Rapids. At this time defendant Charles M. Beckwith became interested in the project, and about seven months later complainant, Murray, purchased 8 shares of stock therein.

The only thing of value in the Keeley franchises consisted of a right to sell and administer the Leslie E. Keeley chloride of gold remedies for the treatment and cure of those afflicted with neurasthenia, or the liquor, tobacco, and drug addictions, for which treatments, as shown by the record, in the course of ten years 1,059 patients in the West Michigan institute paid in the neighborhood of $125,000. It is over division of these and other incidental receipts, as well as ownership and apportionment of the stock, that radical disagreements between the parties have arisen.

The initiation of this project at Grand Rapids under Pritchard's guidance was not propitious. The assets consisted of the rights he acquired from O'Dell, and it is substantially conceded that the O'Dell contract was invalid. Pritchard, however, in various ways issued and disposed of $15,000 of stock having a face value of $25 per share. What he actually realized does not appear. In this distribution Beckwith received 60 shares, for which he testified that he paid $1,500, borrowed from a relative. Other shares were sold to different parties in the usual manner of promotion, and some seem to have been distributed as commissions or given to help make sales. An attorney named W. R.

McGarry, who became active in the matter, received 154 shares, for which it is not contended he ever parted with any money. Pritchard was expected to remain and develop the business, and yet retained 120 shares when he unexpectedly and without notice to his associates left the State and enterprise which he had promised purchasers of stock he would build up and manage. He, however, returned later to Grand Rapids, and was arrested on complaint of Beckwith for defrauding him. An adjustment was reached in the matter, under which he surrendered any interest he might have in the business, leaving McGarry and Beckwith in control of a majority of the issued stock. About August 1, 1901, the institution was running under Beckwith as manager. McGarry participated in the capacity of secretary for a time, but later, as the result of some financial irregularity, turned over his stock to Beckwith and left the State. Beckwith had tried the cure on himself, as had his brother, Guy, successfully, as they testified, and complainant whose office was located across the street testified that he also became a patron of the treatment to his ultimate benefit, about which time he bought the 8 shares of stock for $100, becoming in that way and to that extent financially interested in and disposed to encourage the enterprise. After Beckwith had followed Pritchard to Canada and collected $750 from him the original promoter of the Keeley Institute of West Michigan ceased to figure in these matters.

Beckwith managed the Grand Rapids institute until the spring of 1902, when he left it in the hands of others and went to Detroit to operate a Keeley cure institute there for parties by the name of Waring, where he first learned as he testifies that the O'Dell contract, under which Pritchard had organized the Grand Rapids concern, was fraudulent and void, and that the Detroit institution which he was running was

in a similar questionable position. He thereupon, at the suggestion of one of the owners of the original franchise for the State of Michigan, entered into a contract with those parties granting him all such right for the entire State for $2,000, payable in 40 monthly installments of $50 each. Shortly thereafter he became involved in litigation with the Warings, having refused to longer recognize them as having any right to run the Detroit institution or any other Keeley cure business in the State. In October, 1902, he abandoned the Detroit enterprise and returned to take charge of the Grand Rapids establishment, which had not prospered. That he was then financially embarrassed and practically without credit is plainly shown. He denies emphatically having then told complainant that he was "at the end of his rope," but whether he did or not the figure of speech was not inappropriate. He had just been discharged from bankruptcy when the West Michigan institute at Grand Rapids was organized. It had not been profitable up to that time. He had abandoned the Detroit concern, was involved in litigation in Detroit, had importuned various parties unsuccessfully for financial aid in his Keeley cure enterprises, and a man named J. W. Fales, who, under an alleged prior assignment from the original source, claimed paramount rights, was demanding of him $5 per patient royalties. While affairs were in this condition he solicited assistance from complainant, whom he induced to take an interest and become a partner with him in the business.

It is undisputed that at this time an agreement was reached between these parties under which they were closely associated together and co-operated in matters relating to the Keeley cure business until the differences arose which resulted in this suit. The two first and most important matters in difference here, relating to which much detailed evidence is introduced, both oral and documentary, are whether their agreement,

which is conceded to have been for equal interests so far as it went, included the Grand Rapids Keeley Institute of West Michigan, and whether the money borrowed at that time was an indebtedness of and to be paid by the partnership or a personal liability to be borne by complainant. As to this the testimony of complainant and Beckwith is in direct conflict. To traverse and discuss all the incidents and transactions in evidence touching the relations of these parties, respectively urged and argued to refute or substantiate these conflicting claims, would be of no general benefit or interest. As to those issues, after a careful examination of the record, we do not disagree with the following facts found and conclusions reached by the trial court:

"At this time the business was practically a failure, the company at Grand Rapids was in debt, and C. M. Beckwith was unable to meet the expenses of the lawsuit in Detroit with the $50 per month payable on the contract and the royalties and other expenses due from the Grand Rapids institute, and it became necessary for him to get financial assistance. After vainly endeavoring in divers directions to obtain money or backing, he called upon complainant in February, 1903, or shortly before that. He stated to complainant that he had learned the O'Dell contract was fraudulent and void; that he had a contract for the franchise for the entire State of Michigan; that he had a lawsuit on hand with the Warings at Detroit which would probably have to be fought out; that he would have to have another lawsuit with Fales over the validity of the O'Dell contract and his right to royalties from the Grand Rapids institute; that he was unable to continue the business on the contract and pay expenses and lawyers' fees, and stated that, if complainant could assist him to borrow sufficient money to settle up these different matters and carry them through, the money so borrowed would be paid out of the proceeds of the business; that he, Dr. Murray, would not be required to invest any money in the business. All he would be required to do would be to get credit for the business,

and that the complainant would have a one-half interest in all of his, C. M. Beckwith's, holdings, including one-half of the Keeley Institute of West Michigan.

"The complainant looked into the matter, and concluded to go into the scheme and render the assistance required, and so proposed by Beckwith. Acting on this agreement, complainant raised $2,200 on two notes given by Beckwith and indorsed by himself, and further secured by an assignment in blank signed by Beckwith of the 334 shares of stock Beckwith then held and claimed to own. This stock was assigned to one Jennie Campbell. In addition the complainant put in about $500 of his own money. The money so raised was used in settling for the contract (for the original franchise) with Radford, Fales, and McVittie in settling the lawsuit with the Warings over the eastern portion of the franchise so-called, paying attorneys and incidental expenses, and the complainant and C. M. Beckwith became the joint owners of the franchise for the whole State of Michigan and of the entire interest in the so-called Keeley Institute of West Michigan and partners in the entire enterprise."

When the emergencies under which this partnership was initiated had been met and pressing matters adjusted, a suit was begun in the Kent county circuit court in chancery by complainant in behalf of himself and Beckwith to relieve the partnership of Fales' demand for royalties which he was then pressing. The suit was prosecuted to a successful issue in this court (*Murray* v. *Fales,* 142 Mich. 605 [106 N. W. 282]); and is of interest in this connection.

Following this decision Murray and Beckwith organized a corporation, with a view to promoting a Keeley institute in Detroit, called the Keeley Institute of Michigan, with a capitalization of $50,000, $20,000 common and $30,000 preferred stock, the shares $10 each, and all their rights to royalties, etc., as adjudicated to them in the case of *Murray* v. *Fales, supra,* and the right to royalties under a contract of the Keeley Institute of West Michigan; the franchise and contract men-

tioned being appraised by them at $43,000, but "turned in at $30,000 in payment of common stock." The amount of preferred stock actually paid was stated to be "the sum of no dollars." No institute was opened by or under this corporation. The record indicates that 10 shares of its stock were credited to their attorney, and the rest divided between Beckwith and Murray. The bookkeeper of the Grand Rapids institute, who states that he went there once a month and worked up the month's business, using as a basis a little blotter, kept in the office, of daily transactions of the business of the institute, testified that the "Keeley Institute of Michigan and the Beckwith and Murray accounts were merged," that the items made on that occasion were all entered up under instructions of Beckwith, and that Murray had told him to do as Beckwith directed.

After their combination in 1903 complainant actively joined with Beckwith in pushing and developing the West Michigan institute, using his social and other affiliations in procuring patrons, spending much time at the institution advising and assisting in the business, helping to adjust entanglements with the parent concern at Dwight, Ill., and with other creditors, furnishing financial aid by loaning his credit, and working generally with Beckwith to make the enterprise successful. Together they took steps to negotiate for and gather in yet outstanding stock of the concern, and eventually secured practically all of it, some being taken in the name of Beckwith, but most of it in Murray's, though of the whole capital stock Beckwith held a majority. From the beginning of their joint activities each was credited with a salary, Beckwith, who was supposed to devote his entire time to the business as manager, being credited as receiving $2,000 per year, and Murray $1,500, until April 30, 1909, when by an agreement between them their salaries were no

longer credited, and a resolution was passed at a meeting of the stockholders held June 4, 1909, that:

"No salaries will be allowed by the company or charged by the officers or paid to the president and secretary and treasurer for services rendered after May 1, 1909."

Even upon this subject of salary, the beginning and end of which is all a matter of record, the parties are widely at variance. Beckwith testified that Murray's salary account was a "fake," the credits being made to him on the books because one Nellie Redlon, who owned 20 shares of stock, was demanding dividends as early as the stockholders' meeting in January, 1903, and threatening litigation unless her stock was bought at par, and the trouble was such that it was agreed between him and Murray to also credit Murray with a salary, fixed at $1,500, Beckwith having right along been getting a salary of $2,000 which was credited to him; in other words, he testified that they were doctoring the books of the corporation for a fake financial showing to discourage Nellie Redlon and any other outside stockholder who might bother them. While Murray testified the entries were honest, in pursuance of an agreement as to their respective salaries made in 1903, when they became partners, and that when they agreed in 1909 to charge off or discontinue the salary credits it was because "they were not paid, and people were drumming us, and our credit was poor, and anything that was done in the institute I had to O. K. and indorse."

Aside from Murray's participation, the institute was apparently run as a family affair of the Beckwiths who lived out of and managed it. Guy Beckwith was employed and lived there with his wife, who was employed as housekeeper. Murray was friendly with, and manifestly had full confidence in, Beckwith, who, as manager in charge, handled the books and money.

Murray at times received comparatively small quantities of money from the concern, but was led to believe that the expenses were such that there was little, if any, profit, that Beckwith was economizing and drawing as little money as possible for his own necessities, and that neither should think of drawing his full salary. Money of the company was used in purchasing outstanding stock and paid to keep up interest on the notes originally given and signed by both parties when Murray went into the venture, and charged on the books to the joint account of Beckwith and Murray. Two notes given at that time to Mrs. Robinson and Mrs. Campbell for money loaned on Murray's solicitation and credit, amounting to over $2,000, were renewed every six months, and the interest regularly paid out of the funds of the institute for over seven years. These notes became one of the serious matters in dispute, after the differences had resulted in hostility, Beckwith claiming they were a personal debt of Murray's.

We are impressed from a study of this record, as was the trial judge, that after Beckwith and Murray joined forces in 1903, although they maintained the corporate organization and kept up its records, as a convenience, for offensive and defensive purposes, and because there was yet outstanding stock, they in fact and effect ran the business as a private partnership, treating it and its assets as their own, with no consideration for or thought of the interests of the corporaation as such or its other stockholders, except as they might be annoyed by them, or to secure their stock and get rid of them as cheaply as possible. Although no serious break had occurred before April 30, 1909, Beckwith and Murray then got together and had a settlement of accounts, in which certain bills receivable and notes were divided, and, as Murray under-

stood, each canceled what was due him from the company in order to put it out of debt; but Murray claims to have later discovered, and the trial court found, that $2,650 of money taken out of the business by Beckwith which did not show in the bank account was privately charged on the books by Beckwith, or, under his direction, one-half to each of them. While under the conflicting testimony and manner in which the books were kept by Beckwith, or under his direction, it is difficult to determine with satisfactory certainty just exactly the full situation, we are convinced that the trial court is substantially correct in the conclusion that up to April 30, 1909, Beckwith drew practically his $2,000 per year salary, and Murray received during that time about $1,700.

In January, 1910, Beckwith became seriously ill, and was unable to get around or attend to business until July, 1910, when he again resumed active management of affairs. During a portion of the interim his brother Guy managed the business. He was called away in March to look after a contract with which he was connected, after which Murray was in charge until Beckwith's return. In the spring of 1910, when Beckwith was well enough to discuss business, Murray claims to have informed him they had finally secured all the outstanding stock and proposed that they "split up according to our agreement," which he testified Beckwith had always recognized, but delayed dividing their stock until they secured the stock of Nellie Redlon, which was the last; that Beckwith then said, "All right; when Bill Eaton [the bookkeeper] comes over, we better speak to him"; that with Beckwith's approval he secured the consent in writing of Mrs. Campbell, who held 354 shares standing in Beckwith's name as security for the money they originally borrowed, and again spoke about the matter when it was again agreed that the bookkeeper should reissue the stock divided

equally between them; that this was not done, and, when he later spoke to Beckwith about it, the latter denied that there was any such agreement. This was followed by a controversy and quarrel between the parties which resulted in Beckwith and his family, holding a majority of the stock, electing themselves officers of the corporation with good salaries and turning Murray adrift.

The hearing of this case was long and exhaustive. It was commenced April 25, 1912, and taking testimony then begun. When the parties first rested is not disclosed. The case was finally disposed of in circuit court January 29, 1914. The first findings were filed on June 19, 1913, and the original decree on August 2, 1913. In these findings and decree the court determined, amongst other things, that Murray was entitled to a half interest with Beckwith in the stock, assets, and profits of the two defendant corporations, passed upon various claims of the parties and entries made upon the books by Beckwith, which in certain particulars were declared erroneous and contrary to the facts, indicated the possibility of an adjustment between the parties, and left the matter of an accounting and appointment of a receiver open for a further hearing if required. Further testimony was taken October 11, 1913, followed by supplemental findings and decree on October 22d. A petition by Emma Beckwith as administratrix of Charles M. Beckwith, deceased, to open the decree was granted November 25, 1913, followed by further testimony and findings, and a final, supplemental decree filed January 29, 1914.

In the original decree of August 2, 1913, the court determined that Beckwith and Murray were equal partners in their Keeley cure enterprise, including· the Grand Rapids institution; that the money they borrowed through Murray's efforts was a joint liability to be borne by the enterprise; that subsequent to their

settlement of April 30, 1909, and particularly after Murray was excluded from knowledge or participation in the conduct of the business following their dissensions in 1910, the books of the concern had been manipulated in certain particulars to Murray's disadvantage. After a further hearing upon the deferred questions of complainant's application for an accounting and appointment of a receiver, the court in its findings stated that a receiver should be appointed for the two defendant corporations, but no order or decree was entered to that effect, because, as counsel state in their brief, a bond was filed and appeal taken. The supplementary decree of October 22, 1913, "amendatory of the findings and decree heretofore made herein so far as they conflict herewith," determined and decreed that the estate of Beckwith, deceased subsequent to the first hearing, owed and should pay the Keeley Institute of West Michigan $5,157.38, and said institute should have a lien on his stock therefor; that the institute owed and should pay Murray $379.51, and that $404.91 owing from the Keeley Institute of West Michigan for royalties, and all royalties earned after October 31, 1913, should be equally divided between Murray and Beckwith's estate.

The decree was thereafter opened by an order of the court "in the interest of justice and equity between the parties" to take further testimony "under an issue or issues to be framed between the parties hereto, and for a rehearing so far as the same may be proper," upon a petition therefor by Mrs. Beckwith, claiming that she had advanced and loaned certain money to her husband for which she had a lien upon his stock in the Keeley Institute of West Michigan, and praying that the decree previously rendered be modified to protect her rights. After hearing evidence upon the issues then presented, further findings were made and a final supplemental decree rendered holding that Mrs. Beck-

with had no lien upon her husband's stock by assignment or conveyance, but that she had, in fact, loaned him certain money which he used in paying liabilities of said company, and in justice the estate should be credited with that sum and interest, amounting to $1,-706.97. The former decree was therefore

"amended by deducting that amount from the amount due from the estate of the said Charles M. Beckwith to the said Keeley Institute Company of West Michigan, and that there is due from the estate of said Charles M. Beckwith to the said Keeley Institute Company of West Michigan the sum of $3,450.41."

We gather the main essentials of the court's decision from its various findings and decrees as they appear in the record to be substantially as follows: Having determined the two leading questions as before stated, the court finally found upon an accounting and decree that the Beckwith estate owed and must pay the Keeley Institute of West Michigan $3,450.41, less $202.47, one-half of the $404.95 royalties found due from the institute and directed to be paid by it to the said estate and Murray in equal proportions, leaving the estate indebted to the institute $3,247.94, for which it is given a lien on Beckwith's stock; that the estate owed and is directed to pay Murray $379.51 together with his half of the royalties found due ($202.47), making a total of $581.98. This, in effect, also gives Murray, though not directly payable to him, $1,623.97 from the Beckwith estate as his half of the amount which the estate is required to pay to the West Michigan institute, in which he was an equal partner with Beckwith.

To reach the above result the controlling questions to be determined were issues of fact raised by the irreconcilable testimony of the contending parties. The case was long drawn out, heard and reheard as different questions arose. The record makes clear that much pains and time were devoted by the court to reviewing

the evidence in its various aspects and working out its findings. The testimony was taken in open court at intervals. The learned circuit judge before whom the case was tried saw and heard the witnesses as they testified before him under varying circumstances at different times as the case developed. It is true, as urged by counsel, that it becomes the duty of this court to hear the case *de novo* and pass upon the facts; yet it has been more than once said that the advantage which that court has in passing upon the credibility of witnesses as their testimony is listened to in open court is an element which may be taken into consideration by this court in reviewing the conflicting testimony of those witnesses as found in the printed record. A study of this ample record has led to the conclusion that the weight of convincing evidence fairly supports the result reached by the trial court upon the above propositions.

Upon the showing made in this record we do not think the court is justified in ordering dissolution of the defendant corporations, or appointing a receiver to take charge of their assets and wind up their affairs. Neither of them is shown to be insolvent or financially embarrassed.

The Keeley Institute of Michigan is practically dormant; its only function thus far being to carry title to the Keeley franchise rights in Michigan and receive any royalties due under them.

As to the Keeley Institute of West Michigan, which is the real subject of contention, the testimony discloses that after the death of Charles Beckwith, on July 2, 1912, his brother Guy took charge of the business as manager, by approval of the parent Keeley Institute of Illinois (which has certain control over the appointment of managers in institutions operating under franchises from it), his salary being fixed at $250 per month by the board of directors, which was

composed of members of the Beckwith family.   It is
shown, apparently without dispute, that under his man-
agement during the pendency of this litigation the in-
stitute has prospered and progressed, paid all its ex-
penses and debts, except as contingent upon this suit,
and on May 1, 1915, had profits on hand represented
by real estate loans and cash amounting to over $2,000.
No insolvency, mismanagement of the business, or dis-
sipation of the assets of the corporation are shown.
Circumstantially its condition tends to confirm com-
plainant's claim of a leak or diversion of funds when
Charles Beckwith was manager. The fact that wrong-
ful control and use of certain stock in the corporation
equitably belonging to complainant, or in which he has
a beneficial interest, excludes him from office or active
participation in the management, does not in itself
justify the appointment of a receiver or a dissolution of
the corporation, even though a case calling for some
equitable relief is made out.

"Courts of equity will not ordinarily, by virtue of
their general equitable jurisdiction, or by virtue of
their visitatorial powers over corporate bodies, seques-
trate the effects of the corporation or take the manage-
ment of its affairs from its officers and commit it to a
receiver, whether upon the application of creditors or
of shareholders." *Town* v. *Car Co.,* 172 Mich. 519
(138 N. W. 338).

With the respective rights of the parties determined
as and to the point above indicated, a decree directing
only an equal division of the stock would not be full
or adequate relief under the circumstances shown, nor,
as we view it, ultimately in the interest of either party.
Complainant's bill asks specifically for a receiver of
the corporations, and also contains a prayer for gen-
eral relief.   It outlines an agreement by which Beck-
with and Murray combined their capital, credit, skill,
and labor together in a business enterprise for common

and equal profit. The evidence supports the claim that they agreed to be and were partners and equal owners in whatever Beckwith then had or controlled in the Keeley cure business or whatever they subsequently acquired, and a part of their project was to pick up the then practically worthless outstanding stock of the Grand Rapids institute, which they eventually did. They never divided up the assets acquired in this common enterprise for joint profit. Partnership property held in the name of one partner is held in trust for the partnership. The death of a partner dissolves the partnership, and, as a general rule, the surviving partner is entitled to possession of the partnership assets to adjust and settle up the affairs of the concern; a manifestly improper and impossible course here, with intervening corporations which they created and maintained, with separate legal entity, as artificial persons, under distinct official control until ended by appropriate legal proceedings. That which the partnership directly owned and controlled was stock in those corporations, by a majority of which officers authorized to control and manage the affairs of the corporations were selected.

Without direct interference with the control and business management of these defendant corporations, except to restrain them and their officers from disposing of, incumbering, or sequestering their assets, we think it proper under the circumstances of this case, and within the power of the court under complainant's general prayer for relief, to wind up the affairs of the partnership as such by placing the stock of the two companies in the hands of a receiver, except 20 shares heretofore assigned to Mrs. Beckwith and 2 shares to Guy Beckwith in the West Michigan institute, and 10 shares to Guy Beckwith in the Keeley Institute of Michigan, which complainant is willing to concede, and that the receiver be authorized to sell said stock to the high-

est bidder as the court may direct; the proceeds to be equally divided between the Beckwith estate and complainant; the stock of the Beckwith estate, however, to be subject to the lien of the West Michigan Institute for the amount heretofore found due it from said estate.

The decree of the circuit court is accordingly affirmed, with costs to complainant, and the case remanded for further proceedings in harmony with this opinion.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.